**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JEANELLE HUGHES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 12 C 09494 |
| | ) | |
| SANDRA K. JONES, Child Protection | ) | Judge John J. Tharp, Jr. |
| Investigator, DCFS, in her individual | ) | |
| capacity; and PAMELA M. FOSTER-STITH, | ) | |
| Supervisor, DCFS, in her individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jeanelle Hughes, a school teacher certified to teach in Illinois, filed this civil rights lawsuit against Sandra Jones and Pamela Foster-Stith, two investigative employees of the Illinois Department of Children and Family Services ("DCFS"), in their individual capacities. Hughes alleges that the defendants violated her constitutional right to due process when they indicated a finding of child neglect against her. The Defendants now move to dismiss the suit for failure to state a claim, or alternatively, on qualified immunity grounds. For the following reasons, the motion is granted in part and denied in part.

**I.  Background**

**A.  The Illinois DCFS System for Child Abuse and Neglect Reporting**

This case involves the investigation and reporting system for child abuse and neglect in Illinois, which is administered by DCFS. The framework for the system is described in the Illinois Abused and Neglected Child Reporting Act, which requires DCFS to "protect the health, safety and best interests of the child in all situations in which the child is vulnerable to child abuse or neglect." 325 Ill. Comp. Stat. 5/2. To achieve this mandate, DCFS operates the Child

Abuse and Neglect Tracking System ("CANTS"), which involves a child abuse and neglect hotline, investigations into allegations of child abuse and neglect, recordation and disclosure of (in limited circumstances) the findings of its investigations, and a system for appealing findings.

When investigating a report of child abuse or neglect, DCFS investigators must determine whether credible evidence supports the allegation. DCFS regulations define "credible evidence" to mean "the available facts when viewed in light of surrounding circumstances would cause a reasonable person to believe that a child was abused or neglected." Ill. Admin. Code, tit. 89, § 300.20. The Seventh Circuit has interpreted the "credible evidence" standard to require DCFS investigators to "take into account *all* of the available evidence that tends to show that abuse or neglect did *or* did not occur," including both inculpatory and exculpatory evidence, because "[o]nly then may the investigator decide whether that totality of evidence would cause a reasonable individual to believe that a child was abused or neglected." *Dupuy v. Samuels*, 397 F.3d 493, 506 (7th Cir. 2005). If DCFS determines that credible evidence exists to support the allegation, the report is designated as "indicated." If there is no credible evidence to support the allegation, DCFS designates the report as "unfounded." 325 Ill. Comp. Stat. 5/3. DCFS maintains the indicated reports on a state central register subject to a reticulated retention schedule. 325 Ill. Comp. Stat. 5/7.7.

Because the potential ramifications of an indication of child abuse are so severe for child care providers, such workers subject to DCFS investigation are entitled to special process. In their initial investigations, DCFS investigators are required to determine whether the alleged perpetrator is a child care worker. Ill. Admin. Code, tit. 89, § 300.160(c)(1). State regulations define a "child care worker" as "any person who is employed to work directly with children and any person who is an owner/operator of a child care facility," which includes "schools, including

school teachers and administrators, but not tenured school teachers or administrators who have other disciplinary processes available to them." Ill. Admin. Code, tit. 89, § 300.20. Under the state regulations, a person is to be considered a child care worker if she "has applied for, or will apply within 180 days for, a position as a child care worker; is enrolled in, or will commence within 180 days, an academic program that leads to a position as a child care worker; or has applied for a license as a child care worker." *Id.*; *see also Dupuy*, 397 F.3d at 510 (finding license holders and people entering child care careers are entitled to heightened protections).

Investigators are to provide the alleged perpetrator with a notice of the investigation ("CANTS Notice") and explain the information contained in the required CANTS Notice forms, including the special rights to which child care workers are entitled. Alleged perpetrators who are childcare workers are entitled to a one-hour administrator's teleconference before any decision to indicate is made. "The administrator's teleconference provides the alleged perpetrator the opportunity to present documentary evidence or other information that supports his or her position and provides information to assist the Department in making the most accurate decision regarding the allegations." Ill. Admin. Code, tit. 89, § 300.160(c)(1)(A). If a DCFS investigator intends to make a recommendation to designate a child care worker's report as "indicated" for abuse or neglect, the investigator must, prior to the administrator's teleconference, schedule an in-person meeting to inform the alleged perpetrator of the decision that the case be indicated and to provide a CANTS Notice form and a redacted investigative summary. Ill. Admin. Code, tit. 89, § 300.160(c)(2)(D).

A person may appeal an indicated report to an administrative law judge ("ALJ"), who determines at a full administrative hearing whether the report should be amended or removed from the state's central register. During the hearing, both DCFS and the alleged perpetrator may

present evidence and call and cross-examine witnesses. DCFS bears the burden of showing that the indicated finding is supported by a preponderance of the evidence. Ill. Admin. Code, tit. 89, § 336.100(e). The DCFS Director can accept, reject, or modify the ALJ's recommendation and enter the final administrative decision. Child care workers are entitled to expedited administrative appeals, to be completed within thirty-five days of the receipt of the request for the appeal. Ill. Admin. Code, tit. 89, § 300.160(c)(1)(B).

While an appeal is pending, however, the "indicated" report remains in the central register. School superintendents are permitted to access the central register to do background investigations. *See* 325 Ill. Comp. Stat. 5/11.1(a)(11). Prospective employees of a child care facilities who would have "any possible contact with children in the course of their duties" must, as a condition of employment, authorize prospective employers to check the central register "to ascertain if such applicant or employee has been determined to be a perpetrator in an indicated report of child abuse or neglect." 225 Ill. Comp. Stat. 10/4.3, 10/4.2; *see also Lyon v. Dep't of Children & Family Servs.*, 209 Ill. 2d 264, 273, 807 N.E.2d 423, 431 (Ill. 2004) (discussing the potential impact of an indicated report on a teacher's licensing and employment prospects).

### B. Factual Background[1]

On March 25, 2011, the DCFS child abuse hotline received an anonymous call regarding the plaintiff, Jeanelle Hughes. The caller reported that Hughes' car smelled like alcohol and that Hughes was "usually intoxicated" when she picked up her seven-year-old daughter, V.V., at the bus stop. The caller also stated that Hughes left her daughter and another child outside and unsupervised in sight of the Des Plaines River for long periods of time. Compl. ¶¶ 42–44. On

---

[1] In reviewing a motion to dismiss, the Court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in the plaintiff's favor. *See Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013). The factual background is summarized with this standard in mind.

March 26, 2011, DCFS conducted a follow-up interview (apparently by phone) with the anonymous caller, in which the caller stated that she had seen Hughes at the bus stop with dilated pupils, smelling like alcohol. The caller explained that she was in nursing school and thus was "able to decipher" that Hughes was intoxicated. *Id.* ¶ 45. The caller had no relationship with Hughes and did not know her name; she did, however, know the daughter's address.

Defendant Sandra Jones, a DCFS child protection investigator, was assigned to investigate this hotline report. On March 28, 2011, she went to Hughes' home but no one was there. Jones neither left a copy of the CANTS Notice for Hughes nor mailed it to her (though at this point, so far as the complaint reveals, Jones had no basis to know that Hughes was a child care worker). *Id.* ¶ 46. On April 11, 2011, Jones returned to Hughes' home to again find no one there. This time, the management company let Jones into the apartment complex; Jones wrote "Please call immediately" on the back of her business card and slid it under Hughes' apartment door. *Id.* ¶ 47. Again, Jones neither left a CANTS Notice for Hughes nor mailed one to her. When Hughes arrived at home later that day, she saw the business card and called Jones back. Jones was unavailable, so Hughes left a voicemail, stating that she did not know why the card was placed under her door and asking Jones to call her back. *Id.* ¶ 48. Jones returned the call, and during this initial phone conversation, Hughes informed Jones that she was a school teacher. The complaint does not indicate whether Jones advised Hughes during this call that DCFS had received an anonymous report about her conduct, nor does it indicate how long they spoke and what they discussed other than agreeing to meet two days later, on April 13, 2011. *Id.* ¶¶ 49–50. Jones later canceled that meeting, and the two rescheduled for April 15, 2011. Jones did not show up for the rescheduled meeting and made no attempts to reschedule it. *Id.* ¶¶ 52–54. Jones never sent Hughes a CANTS Notice form, and, despite Hughes having informed her that she was

a teacher during their initial phone conversation, never took any steps to identify Hughes as a child care worker entitled to special process in the investigation. *Id.* ¶¶ 51, 55.

On April 27, 2011, Jones went to the elementary school that Hughes' daughter attended. There, she spoke with the school's principal, who told Jones that Hughes' daughter was a good student with no behavioral issues. *Id.* ¶¶ 56–57. While Jones was at the school, the principal also contacted an employee of the bus company used by the school. The principal told Jones that the bus company employee stated that "there were no behavioral issues" while another bus service employee recalled an incident in January 2011 where Hughes appeared intoxicated when she picked her daughter up from the bus terminal. *Id.* ¶¶ 58–59. The principal relayed this information (but apparently not the identities of the bus company employees) to Jones, who did not attempt to interview either of the employees and did not seek or review any report of the January 2011 incident. *Id.* ¶ 60.

While at the elementary school, Jones also interviewed V.V., Hughes' seven-year-old daughter, without seeking Hughes' permission. *Id.* ¶ 62. V.V. told Jones that her mother did not drink alcohol, and denied that her mother was intoxicated at the bus terminal. *Id.* ¶ 63. Jones also interviewed A.S., a five-year-old friend of V.V.'s, without seeking the permission of A.S.'s mother. *Id.* ¶ 64. A.S. told Jones that Hughes "does drink" and that she had seen Hughes "drinking and driving a couple of times." *Id.* ¶ 65. A.S. did not specify what beverage Hughes was purportedly drinking while driving, and Jones did not use the word "intoxicated" or ask A.S. what Hughes looked like when drinking in the car. *Id.* ¶ 66. During the investigation, Jones also interviewed V.V.'s doctor, who told Jones that V.V. was in good health and that Hughes had never appeared intoxicated in his presence. *Id.* ¶ 68.

On May 23, almost a month later and the day before the 60-day investigatory period prescribed by regulation expired, Jones returned to Hughes' home without having attempted to schedule an appointment. *Id.* ¶ 69. Again, Hughes was not there, but in pressing the apartment intercom system, the system initiated a call to Hughes' cell phone and she answered. *Id.* ¶ 70. Hughes began speaking with Jones and expressed her frustration that Jones had missed their meeting and had interviewed V.V. without her consent. *Id.* ¶ 71. At that point, the intercom system disconnected the call.[2] Jones did not attempt to contact Hughes or ring the intercom buzzer again, nor did she leave a CANTS Notice at Hughes' home. *Id.* ¶ 72. The next day, Jones recommended to her supervisor, defendant Pamela M. Foster-Stith, that Hughes be classified as refusing to cooperate with the investigation, which, according to the complaint, would allow DCFS to avoid an otherwise mandatory interview with her. The complaint does not allege whether Jones advised Foster-Stith that Jones had made two interview appointments with Hughes but had canceled one and failed to show up at the other. Foster-Stith approved the designation. *Id.* ¶¶ 73–74.

The same day, May 24, 2011, without having attempted to interview her, Jones left a voicemail for Hughes notifying her that the investigation was concluded and that Hughes had been indicated for child neglect. *Id.* ¶ 75. Hughes alleges that DCFS made the indicated finding on the basis of an anonymous hotline call and the statements of a five-year-old and an unidentified bus driver, without considering exculpatory evidence such as V.V.'s denial of neglect or the care V.V. received (including adequate food, clothing, and shelter). *Id.* ¶¶ 76–77. According to the complaint, the actual reasons behind the defendants' decision to indicate Hughes were the need to close the case file within the 60-day prescribed period, to retaliate for

---

[2] The defendants do not contend that Hughes hung up on Jones, and the Court would be required to infer otherwise at this stage of the proceedings in any event.

Hughes' having questioned Jones' behavior as an investigator with regard to missing scheduled interviews and interviewing V.V. without permission, and to exercise arbitrary power against Hughes. *Id.* ¶ 78. At no time prior to the indicated finding was Hughes provided with a CANTS notice or notice of the investigator's intent to indicate. *Id.* ¶¶ 47, 55, 79. Nor was she provided with the opportunity to have the investigation reviewed at an administrator's teleconference or any other type of hearing before the indicated finding was made. *Id.* ¶ 87.

Hughes received a letter from the DCFS on May 25, 2011, informing her that she had been indicated pursuant to Allegation No. 10/60, "Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare by Neglect." *Id.* ¶ 80. The letter did not indicate the factual basis of the indicated finding and did not include information about a right to an expedited appeal. *Id.* ¶ 81. Shortly after receiving the letter from DCFS, Hughes filed an appeal and requested that it be expedited. *Id.* ¶ 90. On June 2, 2011, she also sent Jones a letter requesting expedited process in which she enclosed her teaching certification. Jones never responded to this letter and never informed DCFS about Hughes' entitlement to an expedited appeal. *Id.* ¶¶ 91–92.

On June 28, 2011, a pre-hearing conference was held, during which Hughes informed the administrative law judge ("ALJ") that she was a child care worker entitled to an expedited appeal. *Id.* ¶ 93. The DCFS attorney told Hughes that because Hughes was not currently employed, she wasn't entitled to the special process due child care workers. *Id.* ¶ 94. The ALJ informed Hughes that he would look into the matter. *Id.* ¶ 96. The full administrative hearing was set for August 10, 2011, more than thirty-five days after Hughes' appeal was filed. *Id*. ¶ 96. On July 15, 2011, Hughes followed up with the ALJ by sending her teaching certificate and applications for teaching positions. *Id.* ¶ 97. Hughes never received a response from DCFS or the

ALJ regarding this letter, although a few days before her hearing, an attorney for DCFS conceded that Hughes was entitled to special expedited process, but that her rights to expedited process were "water under the bridge" at that point. *Id.* ¶¶ 97–98.

At the August 10, 2011, administrative hearing before the ALJ, DCFS called only Investigator Jones as a witness. *Id.* ¶ 101. Jones admitted that she never asked A.S. if the substance that she witnessed Hughes drinking was alcohol or if Hughes appeared intoxicated.[3] *Id.* ¶ 65–66, 102. Jones also testified that she never spoke with the bus service employees or read any report about the January 2011 incident where Hughes allegedly appeared intoxicated when she picked her daughter up from the bus stop. *Id.* ¶¶ 60, 102. Regarding the allegation that Hughes left her daughter unsupervised in sight of the Des Plaines River, the only evidence presented at the hearing was Jones' testimony that she saw a body of water outside of Hughes' home, but that it could have been "a bunch of snow melting." *Id.* ¶ 103. Hughes also testified at the hearing. She testified that she does not drink, but that she takes doctor-prescribed medication that could, at times, make her appear drowsy. *Id.* ¶ 104. In closing argument, counsel for DCFS conceded that Hughes had not driven her daughter while intoxicated on alcohol, arguing instead that "she was intoxicated on Prozac and Xanax, both of which can cause drowsiness, both of which can impair one's ability to drive." *Id.* ¶ 107.

On September 14, 2011, the ALJ affirmed the original indicated finding. According to the complaint, the ALJ's determination was based solely on Hughes' use of the medication that had been prescribed to her, because the ALJ determined that the use of those drugs while driving created an injurious environment for her daughter. *Id.* ¶ 108. Evidence regarding Hughes' prescription medication was not part of the investigative file that served to indicate Hughes in the

---

[3] A.S.'s mother additionally testified that her daughter did not understand "drinking" to imply drinking alcohol. Compl. ¶ 67.

first place. *Id.* ¶ 109. On September 20, 2011, Erwin McEwen, who was then the Director of DCFS, issued the final administrative decision adopting the ALJ's recommendation and denying Hughes' request to expunge the indicated finding from the state's central register. *Id.* ¶ 111. Hughes appealed to the Circuit Court of Lake County, Illinois. After retaining counsel, she filed an amended complaint and moved to overturn the final administrative decision. *Id.* ¶¶ 112–13. Soon thereafter, instead of responding to Hughes' motion, the DCFS agreed to withdraw the indicated finding from Hughes' record and remove her from the state's central register. The state court dismissed the case on May 1, 2012. *Id.* ¶ 114.

Hughes filed this § 1983 lawsuit against Jones and Foster-Stith, contending that they violated the Due Process Clause of the Fourteenth Amendment when they failed to (1) consider exculpatory evidence, (2) provide her with notice of the investigation or the evidentiary grounds on which the indicated decision was made, (3) hold a pre-deprivation administrator's conference, and (4) expedite her appeal. Hughes also contends that they were wrong to base the indicated finding on DCFS Allegation No. 10/60, which she claims an Illinois appellate court has determined to be void, and when they Hughes seeks a declaratory judgment that Jones and Foster-Stith violated her constitutional right to due process, compensatory and punitive damages, and fees and costs. This Court has jurisdiction under 28 U.S.C. §1331.

## II. Discussion

The defendants move to dismiss this case on several grounds pursuant to Federal Rule of Civil Procedure 12(b)(6). They argue that the defendants did not personally participate in, and so cannot be liable for, the decision to deny Hughes an expedited appeal. Regarding the alleged lack of notice and pre-deprivation administrator's conference, the defendants argue that the process Hughes received satisfies the balancing test for procedural due process set forth in *Mathews v.*

*Eldridge*, 424 U.S. 319, 334 –35 (1976). They further argue that Hughes could not have suffered damages as a result of the alleged lack of process afforded to her in light of the fact that the ALJ found against her and upheld the indicated finding. In the alternative, they argue that they are entitled to qualified immunity. Finally, they point out that at the time they filed the motion being considered here, DCFS Allegation No. 10/60 was not in fact void because its validity was still at issue in an appeal pending before the Illinois Supreme Court.

A Rule 12(b)(6) motion to dismiss challenges the sufficiency of a complaint. *Hallinan v. Fraternal Order of Police Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). To survive such a motion, a complaint taken as a whole must set forth enough factual detail to give the defendant fair notice of the claims and the grounds upon which they rest, and the factual allegations in the complaint must add up to a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Bell Atl. v. Twombly*, 550 U.S. 544, 555–57, 570 (2007); *Engel v. Buchan*, 710 F.3d 698, 709 (7th Cir. 2013). "The Due Process Clause of the Fifth and Fourteenth Amendments prohibits deprivation of life, liberty, and property without due process of law." *Matamoros v. Grams*, 706 F.3d 783, 789 (7th Cir. 2013) (citing U.S. Const. amends. V, XIV). This constitutional provision endows individuals with both substantive and procedural rights. *Albright v. Oliver*, 510 U.S. 266, 272 (1994) (plurality opinion). By requiring the government to follow proper procedures when depriving a person of life, liberty, or property, the Due Process Clause promotes fairness in such decisions. *Daniels v. Williams*, 474 U.S. 327, 331 (1986). And "by barring certain government actions regardless of the fairness of the procedures used to implement them," the Due Process Clause "serves to prevent governmental power from being 'used for purposes of oppression.'" *Id.* (quoting *Murray's Lessee v. Hoboken Land &*

*Improvement Co.*, 59 U.S. 272, 277 (1856)). Hughes asserts both procedural and substantive due process claims against the defendants in this case.

### A. Defendants' Personal Involvement in the Alleged Deprivation

As an initial matter, it is well-settled that plaintiffs may only bring § 1983 claims against individuals who were personally involved in the constitutional deprivations they purport to have suffered. *See Vinning-El v. Evans*, 657 F.3d 591, 592 (7th Cir. 2011); *Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 614 (7th Cir. 2002). The personal involvement requirement applies to all employees, including supervisors; plaintiffs may not rely on the doctrine of *respondeat superior* to sue supervisors under § 1983 for harms allegedly caused by their subordinates. *See Iqbal*, 556 U.S. at 676; *Doyle*, 305 F.3d at 614; *Lanigan v. Village of E. Hazel Crest, Ill.*, 110 F.3d 467, 477 (7th Cir. 1997). If a supervisor consented to the challenged conduct or directed it, however, that supervisor's personal involvement is a sufficient basis on which to base liability. *See Doyle*, 305 F.3d at 615; *see also Chavez v. Ill. State Police*, 251 F.3d 612, 652 (7th Cir. 2001) (holding that a supervisory defendant to a § 1983 suit would be deemed sufficiently involved if he "directed the conduct causing the constitutional violation, or if it occurred with his knowledge or consent").

Hughes has adequately alleged the involvement of Jones and Foster-Stith in the investigation and decision to indicate her without first providing her with a pre-deprivation administrator's teleconference. Jones personally conducted the investigation of Hughes without giving her a CANTS Notice. Foster-Stith personally approved the request to designate Hughes as uncooperative. According to the complaint, both defendants made the decision to indicate Hughes without a conference. *See Doyle*, 305 F.3d at 615.

The defendants do not contest that Hughes has pleaded their involvement in these alleged pre-deprivation violations; they instead argue that she has not alleged facts showing their personal involvement in the failure to provide her with an expedited appeal. They assert that they have no authority to schedule an administrative hearing,[4] whether expedited or regular, and they note that DCFS regulations require requests for expedited appeals to be made to DCFS's administrative hearings unit, not the unit in which they work. Defs.' Mem. 9, Dkt. 17. Hughes responds that the violation about which she complains is Jones' lack of attention to Hughes' status as a child care worker and the defendants' "failure to take the requisite steps to identify [Hughes] as eligible for pre- and post-deprivation processes." Pl.'s Resp. 5, Dkt. 20. Hughes alleges that Jones did nothing after Hughes affirmatively informed her that she was a school teacher, and that the letter she sent to Hughes notifying her of the indicated finding did not inform Hughes of any right to an expedited appeal. Compl. ¶¶ 50–51, 81, Dkt. 1. Hughes argues that the defendants failed "to meet their own clear responsibility to identify her as eligible for this process so she could utilize her due process rights." Pl.'s Resp. 6 n.5. In this way, she has alleged their personal involvement in the initial failure to designate her as a child care worker entitled to special process. Hughes also alleges that after receiving a letter informing her of the indicated finding, she followed up with Jones regarding her status as a child care worker and requested expedited process. Compl. ¶¶ 91–92, Dkt. 1. This additional allegation is insufficient to suggest that Jones was personally involved in the scheduling of Hughes' appeal. *See Doyle*, 305 F.3d at 615 (affirming dismissal of claims where plaintiff did not allege that the defendants were personally involved in scheduling administrative hearings). Any claims against Jones and

---

[4] Hughes cites *Doyle*, 305 F.3d at 622–23, for the proposition that the ALJ and DCFS Director have absolute immunity that prevents her from pursuing them for the failure to schedule her expedited appeal. *Id.* at 5 n.4.

Foster-Stith predicated on the failure of the appeal to be scheduled in an expedited matter are therefore dismissed, and the Court turns to whether Hughes has adequately alleged her claims.

## B. Procedural Due Process Claim

To maintain a due process action, a plaintiff must establish that a state actor has deprived her of a constitutionally protected liberty or property interest without due process of law. *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013); *Boyd v. Owen*, 481 F.3d 520, 524 (7th Cir. 2007); *Dupuy v. Samuels*, 397 F.3d 493, 503 (7th Cir. 2005); *Doyle*, 305 F.3d at 616. Hughes argues that she was deprived of her right to pursue teaching positions by the defendants having issued an indication of child neglect without the pre- and post-deprivation process guaranteed to her as a child care worker; the defendants argue that she received constitutionally sufficient process and that they cannot be liable for the post-deprivation violation of which she complains (namely, the lack of an expedited appeal).

The first inquiry necessary to determine whether Hughes has alleged a procedural due process violation is whether she has established a deprivation of a constitutionally protected liberty or property interest. *See Mann*, 707 F.3d at 877; *Dupuy*, 397 F.3d at 503. In the context of claims premised on damage to reputation, the deprivation of a protected liberty interest is measured by the "stigma plus" test, which requires a plaintiff to establish (1) damage to a plaintiff's good name, reputation, honor, and integrity, and (2) a resulting inability to pursue the occupation of her choice because of the label. *Mann*, 707 F.3d at 878 (citing *Schepers v. Comm'r, Ind. Dep't of Corr.*, 691, F.3d 909, 914 (7th Cir. 2012)). The Seventh Circuit has previously explained:

> It is well-settled that an individual has no cognizable liberty interest in his reputation; consequently, when a state actor makes allegations that merely damage a person's reputation, no federally protected liberty interest has been implicated. *See Paul v. Davis*,

424 U.S. 693, 711–12 (1976); *Hojnacki v. Klein–Acosta*, 285 F.3d 544, 548 (7th Cir. 2002). Indeed, "mere defamation by the government does not deprive a person of liberty protected by the Fourteenth Amendment, even when it causes serious impairment of one's future employment." *Hojnacki*, 285 F.3d at 548 (internal quotations and citations omitted). Rather, it is only the "alteration of legal status," such as governmental deprivation of a right previously held, "which, combined with the injury resulting from the defamation, justifies the invocation of procedural safeguards." *Paul*, 424 U.S. at 708–09; *Townsend v. Vallas*, 256 F.3d 661, 669 (7th Cir. 2001). As such, when a state actor casts doubt on an individual's "good name, reputation, honor or integrity" in such a manner that it becomes "virtually impossible for the [individual] to find new employment in his chosen field," the government has infringed upon that individual's liberty interest to pursue the occupation of his choice.

*Mann*, 707 F.3d at 878 (quoting *Dupuy*, 397 F.3d at 503). Having an indicated report on the central register "squarely" implicates a protected liberty interest of a prospective child care worker. *Dupuy*, 397 F.3d at 510–11; *see also Lyon*, 209 Ill. 2d at 273–74, 807 N.E.2d at 431–32 (finding that "an indicated report in the central register implicates a protected due process interest"); *Cavarretta v. Dep't of Children & Family Servs.*, 277 Ill. App. 3d 16, 28, 660 N.E.2d 250, 258 (Ill. App. Ct. 1996) ("[I]nclusion on the State register implicates the plaintiff's interest in pursuing his chosen occupation.").

In *Dupuy*, the Seventh Circuit explained that a person is effectively barred from future employment in the child care field once an indicated finding is entered against them because a prospective employee's status on the central register is disseminated to her potential employer by operation of state law during the hiring process, resulting in "a significant, indeed almost insuperable, impediment on obtaining a position in the entire field of child care." *Dupuy*, 397 F.3d at 510–11; *see also Valmonte v. Bane*, 18 F.3d 992, 1001 (2d Cir. 1994) (noting that an indicated finding on a state central register "places a tangible burden" on employment prospects where a state statute required child care providers to consult the central register during the hiring

process). In line with *Dupuy*, Hughes argues that while her indicated finding remained on the central register (a duration of nearly one year), she was effectively prevented from applying to teaching positions because potential employers would inevitably discover her status and refuse to employ her; this is sufficient to establish the deprivation of a protected liberty interest. Although the defendants point out that Hughes does not allege that she was employed as a teacher or that she had applied yet, they do not directly contest her status as a career entrant into the field of child care; they instead argue that she received constitutionally sufficient process.

The parties agree that *Mathews v. Eldridge*, 424 U.S. 319 (1976), governs the analysis of whether the alleged deprivation occurred without due process. The requirements of federal due process are not defined by state rules and regulations; due process requires an independent evaluation of the plaintiff's opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews*, 424 U.S. at 333; *Boyd*, 481 F.3d at 524. The *Mathews* Court explained:

> [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and, finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 334–35. Here, the Court must balance Hughes' right to employment in her chosen field with the risk of erroneous deprivation of that right carried by the procedures followed in her investigation and the probable value of the additional safeguards, in conjunction with the state's strong interest in protecting children from abuse and neglect. *See Mann*, 707 F.3d at 879.

In *Dupuy*, the Seventh Circuit evaluated the sufficiency of the pre-deprivation process imposed on DCFS when investigating and indicating child care workers for child abuse and neglect under an injunction imposed by the district court. The court acknowledged that both

child care workers under investigation for child abuse and neglect and the government have strong interests in an accurate evaluation of the facts of a particular case, the former being interested in avoiding preclusion from work in their field by a false indicated report and the latter in assuring the safety and well-being of children. 397 F.3d at 505. The court cited the "high risk of erroneous deprivation" and specifically the "unacceptable" reversal rate for challenged indicated reports under the original method of evaluating such claims as the determinative factor. *Id.* It held that the "credible evidence" standard used by DCFS requires investigators to consider all available evidence, including inculpatory and exculpatory evidence, when determining whether credible evidence of abuse or neglect exists to support an indicated finding. *Id.* at 504–06. The court tied the requirements of this standard to the availability of a pre-deprivation hearing for child care workers, noting "before a person can be indicated under this standard of proof, the investigator's determination [that an indicated finding is warranted under the credible evidence standard] is subject to review by an examiner who did not take part in the investigation. This review must include a hearing at which the accused individual will have a right to present [her] side of the story." *Id.* at 507.

The *Dupuy* court also specifically considered whether entrants to the child care field, as opposed to those already employed in the field, were entitled to a pre-deprivation administrator's conference. The court recognized that career entrants had substantial interest both in pursuing employment in their chosen profession and avoiding erroneous reports and found that the state shared their interest in avoiding erroneous reports. *Dupuy*, 397 F.3d at 512 (citing *Doyle*, 305 F.3d at 619). Again citing the high risk of erroneous deprivation, the court reasoned that providing pre-deprivation hearing to such people was necessary to correct erroneous decisions before ruining a person's career, and held that even entrants to the field were entitled to notice

and an administrator's conference prior to being placed on register. *Id.* The court described the conference as allowing the accused "the opportunity to tell [her] side of the story and to present evidence that [s]he deems relevant before a new decision-maker." *Id.* at 508.

Here, Hughes alleges that she was a licensed teacher in the process of applying for teaching jobs at the time that she was indicated and that the DCFS investigators took no action to determine or record her status as such even after Hughes volunteered the information. *See, e.g.*, Compl. ¶¶ 51, 72, 91–92. She contends that she was entitled to, but did not receive, notice of the nature of the investigation and the evidentiary grounds on which the indicated decision would be made, consideration by the investigators of all available exculpatory evidence (such as the statements of Hughes' daughter and her daughter's doctor prior to being indicated), and an administrator's conference at which she could present her case before a new decisionmaker before the indicated finding was made and entered on the state central register. As described, the initial decision to indicate Hughes proceeded hastily without regard for her self-reported status as a licensed teacher applying for teaching positions, which, as the defendants do not contest, places her into the category of career entrants to child care work who are entitled to special process. *See* Ill. Admin. Code, tit. 89, § 300.20 (defining child care worker as any person employed to work directly with children, including school teachers, and noting that being "employed as a child care worker" includes people who, at the time of the notice of the investigation, have applied for or will apply for such a position within 180 days). Under *Dupuy*, her allegations are sufficient to state a procedural due process claim against Jones and Foster-Stith.

The defendants also argue that Hughes' claim should be dismissed because she cannot prove that any damages were caused by the alleged violations. They point out that once an evidentiary hearing was conducted on appeal, the ALJ upheld the indicated finding. The

18

defendants rely on *Lossman v. Pekarske*, 707 F.2d 288 (7th Cir. 1983), for the proposition that because the ALJ determined that the indicated finding was supported by a preponderance of the evidence after a hearing, Hughes cannot show any chance that the additional pre-deprivation process would have prevented the indicated finding in the first place. In *Lossman*, the Seventh Circuit found that the plaintiffs failed to show a causal link between the alleged denial of due process and any injury resulting from removal of children from their father's custody pursuant to an ex parte hearing where the result of a later adversary hearing was that the court decided not to return the children to their father's custody. *Id.* at 291. The defendants' premise is debatable,[5] but their reliance on *Lossman* is in any event misplaced; *Lossman* simply confirmed the point the Supreme Court made ten years earlier in *Carey v. Piphus*, 435 U.S. 247 (1978), when it held that, to recover damages for a denial of due process, a plaintiff must prove that the denial itself caused an injury, not just that due process had been denied. But that now unremarkable proposition does not, as the defendants maintain, entitle them to dismissal of the complaint. As the Court also made explicit in *Carey*, procedural due process rights are "absolute" and do "not depend upon the merits of a claimant's substantive assertions." *Carey*, 435 U.S. at 266.[6] "[B]ecause of the importance to organized society that procedural due process be observed," the Supreme Court held that "the denial of procedural due process should be actionable for nominal damages without proof of actual injury." *Id.*; *see also, e.g.*, *Casna v. City of Loves Park*, 574 F.3d 420,

---

[5] Hughes argues that the probable value of additional safeguards is demonstrated by the fact that the final administrative decision was subsequently vacated by agreement without further briefing once she challenged it in state court. Pl.'s Resp. 9, Dkt. 20. It is not clear what conclusion is fair to draw from decision to withdraw the indicated finding, but in *Doyle*, the court found that a plaintiff had stated a due process claim even where an indicated finding against her had been upheld in a final administrative decision before being subsequently vacated by agreement after the plaintiff sought review in state court. *See Doyle*, 305 F.3d at 611, 619 (affirming the dismissal on qualified immunity grounds).

[6] The defendants' failure to discuss *Carey*, even in their reply, after the plaintiff invoked the case, is inexplicable and troubling. Ignoring adverse precedent does not make it disappear.

426 (7th Cir. 2009) (noting the availability of nominal damages for a constitutional violation if a plaintiff is unable to prove compensatory damages at trial); *Brandt v. Bd. of Educ. of City of Chi.*, 480 F.3d 460, 465 (7th Cir. 2007) (acknowledging the availability of nominal damages in certain cases); *Lalvani v. Cook Cnty.*, 396 F.3d 911, 916 (7th Cir. 2005) (similar).[7] Simply put, the plaintiff's procedural due process claim is actionable whether or not she has plausibly pled an injury caused by the alleged deprivation.[8]

The defendants also argue that they are entitled to qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their

---

[7] To the extent that *Berman v. Young,* 291 F.3d 976, 985 (7th Cir. 2002) and *Donald v. Polk County*, 836 F.2d 376, 379–81 (7th Cir. 1988) can be read to state that a due process claim must be dismissed if the plaintiff fails to show actual damages, they cannot be squared with the Supreme Court's holding in *Carey* or this Circuit's many cases acknowledging that a plaintiff may recover nominal damages in the absence of actual damages. Both opinions rely solely on *Lossman* for that proposition, but *Lossman* does not so hold; the statement in *Lossman* on which the *Berman* and *Donald* opinions relied is dicta, based on *Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449, 453 (7th Cir. 1982), which was not a case involving a due process violation. Given these infirmities, this Court is guided by the Supreme Court's opinion in *Carey* and the more recent cases in this Circuit recognizing that actual damage is not an "essential element" of a claim based on a violation of due process.

[8] Three additional points made by the Court in *Carey* bear noting. First, the Court also observed that, "in a proper case" a plaintiff "might well recover damages for mental and emotional distress caused by the denial of procedural due process," even if the provision of process would not have changed the substantive outcome of the dispute. 435 U.S. at 262; *see also id*. at 263–64 ("[W]e foresee no particular difficulty in producing evidence that mental and emotional distress actually was caused by the denial of procedural due process itself. Distress is a personal injury familiar to the law, customarily proved by showing the nature and circumstances of the wrong and its effect on the plaintiff."). Thus, simply because the indicated report was subsequently expunged does not, as a matter of law, mean that the deprivation of due process did not injure the plaintiff. Second, the Court suggested that punitive damages can be awarded even in a case where the plaintiff proves only a deprivation of due process (and thus an entitlement only to nominal rather than compensatory damages), *see id*. at 257 n.11 & 266, a view the Seventh Circuit has endorsed as well, *see, e.g.*, *Calhoun v. DeTella,* 319 F.3d 936, 941–42 (7th Cir. 2003). And third, in *Carey*, the Court adverted to the possible recovery of attorney's fees even when only nominal damages are awarded, and in *Farrar v. Hobby*, 506 U.S. 103, 112 (1992), the Court held expressly that "a plaintiff who wins nominal damages is a prevailing party under § 1988" and is thus entitled to seek attorney's fees (though the recovery of only nominal damages is a factor in assessing the reasonableness of a fee petition).

conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). For a right to be "clearly established" for the purposes of qualified immunity, its contours must be "sufficiently clear" to enable an objectively reasonable official to understand that what he or she is doing violates that right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The defendants point out that several circuits have concluded that state workers investigating child abuse are "nearly always" entitled to qualified immunity. Defs.' Mem. 14, Dkt. 17 (citing *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1023 (7th Cir. 2000) ("[B]ecause the balance between a child's liberty interest in familial relations and a state's interest in protecting the child is nebulous at best, social workers and other state actors who cause a child's removal are entitled to qualified immunity because the alleged constitutional violation will rarely—if ever—be clearly established.")). But the clearly established inquiry is not so nebulous, as *Brokaw* itself made clear in *rejecting* the defendants qualified immunity defense in that case. In order to carry her burden of proving that the constitutional rights she asserts were clearly established, Hughes must either "(1) present case law that has articulated both the right at issue and applied it to a factual circumstance similar to the one at hand or (2) demonstrate that the 'contours of the right are so established as to make the unconstitutionality obvious.'" *Ault v. Speicher*, 634 F.3d 942, 946 (7th Cir. 2011) (quoting *Boyd*, 481 F.3d at 526–27). Because qualified immunity offers not merely a defense from liability, but also provides immunity from suit, courts are admonished to address the question of immunity as early as possible. *Pearson*, 555 U.S. at 231–32. Still, when a motion to dismiss is based on the assertion of qualified immunity, the court should approach the issue with caution because a plaintiff is not

required to plead facts sufficient to overcome this affirmative defense. *See Jacobs v. City of Chicago*, 215 F.3d 758, 765 n.3 (7th Cir. 2000).

Hughes identifies the Seventh Circuit's 2005 decision in *Dupuy*, which preceded the investigation of Hughes by six years, as having clearly established both that DCFS investigators are required to consider all available evidence (including exculpatory evidence) when deciding whether to indicate someone for child abuse or neglect and that child care workers are entitled to pre- and post-deprivation process in the event that any indicated finding is made. The defendants do not identify any way in which *Dupuy* is insufficient to have put the defendants on notice of these due process rights, nor could they. With respect to the former, the Seventh Circuit stated "the term [credible evidence] now is employed in a regulatory context that *contains clear instructions on proper investigative techniques and that explicitly requires that the investigating officer consider all evidence on both sides of the issue*." *Dupuy*, 397 F.3d at 506 (emphasis added). As to the latter, the Court of Appeals made pellucid that before a child care worker can be indicated under the credible evidence standard, the investigator's determination must be reviewed "by an examiner who did not take part in the investigation" and the review "must include *a hearing at which the accused individual will have the right to present his side of the story*." *Id.* Further, the Seventh Circuit emphasized the right that a child care worker has in pursuing employment in her chosen field and specifically noted that the interests of career entrants to the field warranted pre-deprivation process in conjunction with the application of a credible evidence standard that included consideration of both exculpatory and inculpatory information. 397 F.3d at 504–08, 512. The court applied these rights in the context of evaluating a preliminary injunction issued in a class action challenging the then-existing DCFS procedures for investigating and indicating individuals for child abuse and neglect. The class included, and

the court separately considered, child care workers and prospective child care workers (there, license applicants and students in related fields). The court left it to the district court to define "career entrants," but stated that "[c]ertainly, persons actively engaged in the job placement process . . . suffer the sort of harm described in the text." *Dupuy*, 397 F.3d at 512 n.12. As the defendants do not contest Hughes' status as a child care worker and *Dupuy* established the necessity of each of the pre-deprivation violations that were allegedly denied to Hughes in this case, the defendants' assertion of a qualified immunity defense is rejected as to the procedural due process claim.[9]

### C. Substantive Due Process Claim

Hughes also argues that she states a claim for a substantive due process violation. Substantive due process "protects an individual from the exercise of governmental power without a reasonable justification." *Belcher v. Norton*, 497 F.3d 742, 753 (7th Cir. 2007). Both the Supreme Court and the Seventh Circuit have cautioned that "the scope of substantive due process is very limited." *Id.* (citations omitted). Only the most egregious government conduct can be said to be "arbitrary in the constitutional sense." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). The measure of what is sufficiently arbitrary to violate substantive due process differs depending on whether the plaintiff is challenging a legislative or executive act. *Id.* "[O]fficial misconduct will rise to the level of a constitutional violation only if it shocks the conscience." *Palka v. Shelton*, 623 F.3d 447, 454 (7th Cir. 2010).

In support of her claim, Hughes again argues that the defendants impinged her interest in pursuing work as a teacher, her chosen profession, as well as her interest as a parent. The

---

[9] To be clear, this decision is not based on the defendants' failure to follow the state rules and regulations, though it bears noting that those rules have been developed in response to constitutional rulings in challenges to the prior regime in *Dupuy* and other cases.

Supreme Court has stated that substantive due process "provides heightened protection against governmental interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 719–21 (1997). Substantive due process cases require a "'careful description' of the asserted fundamental liberty interest." *Id.* at 721. "Officials bear a heavy burden of justification for curtailing a right that qualifies as fundamental." *Hayden ex rel. A.H. v. Greensburg Cmty. Sch. Corp.*, 743 F.3d 569, 575 (7th Cir. 2014). Fundamental rights have generally been limited to "matters relating to marriage, family, procreation, and the right to bodily integrity." *Albright v. Oliver*, 510 U.S. 266, 272 (1994) (plurality opinion). A parents' liberty interest "in the care, custody, and control of their children" has been described as "perhaps the oldest of the fundamental liberty interests recognized." *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *see also Brokaw*, 235 F.3d at 1018 (collecting cases acknowledging the right to "familial relations"). Although she invokes her right as a parent in her response brief, Hughes does not allege that her child was removed from her care or that the government altered her custody or ability to make decisions concerning her child's care in any way as a result of the indicated finding, nor does she explain in any detail the manner in which she claims her rights as a parent were infringed. *Compare, e.g.*, *Brokaw*, 235 F.3d at 1019 (holding that a four-month separation of a child from his parents implicated a fundamental right to familial relations). The allegations in the complaint are therefore insufficient to suggest that her fundamental rights as a parent were impeded in this case.

Hughes also invokes her liberty interest in pursuing her chosen career in support of this claim, as well, though she does not argue that this interest is a fundamental one. Substantive due process also prohibits irrational government interference in some non-fundamental rights. *See Greensburg Cmty. Sch. Corp.*, 743 F.3d 576; *Wroblewski v. City of Washburn*, 965 F.2d 452,

457–58 (7th Cir.1992). "Where a non-fundamental liberty—sometimes described as a 'harmless liberty,'—is at stake, the government need only demonstrate that the intrusion upon that liberty is rationally related to a legitimate government interest." *Greensburg Cmty. Sch. Corp.*, 743 F.3d at 576 (citations omitted) (noting, additionally, that "[t]his rational-basis variant of substantive due process differs little, if at all, from the most deferential form of equal protection review"). In arguing that she states a substantive due process claim, Hughes takes on more than she needs to in applying the "shock the conscience" standard applicable to fundamental rights, not rational basis review. Her argument that it was conscience-shocking to apply Allegation No. 10/60, which has since been struck down by the Illinois Supreme Court as having exceeded the authority of DCFS, falters here no matter which standard is applied. At the time of the investigation, the Allegation had not yet been struck down. *See Julie Q. v. Dep't of Children & Family Servs.*, 963 N.E.2d 401 (Ill. App. Ct. Dec. 22, 2011), *aff'd*, 995 N.E.2d 977 (Ill. 2013). Hughes therefore cannot argue that it was arbitrary for Jones and Foster-Stith to apply it in the course of an investigation that took place between March and June 2011.

Hughes also argues that it is conscience-shocking for the defendants to have acted for reasons unrelated to the legitimate government interest of safeguarding the welfare of children. She asserts that the defendants decided to designate her report as "indicated" in order to close the case file before the looming state administrative deadline passed (whether or not the investigation was adequate or complete), to retaliate against Hughes for questioning Jones, and to generally exercise arbitrary power over her. In the context of Equal Protection violations, to which the Seventh Circuit has likened the rational-basis variant of substantive due process, there is debate about whether it is necessary to show actual animus or other illegitimate motive to sustain a class of one claim, *see Del Marcelle v. Brown Cnty. Corp.*, 680 F.3d 887 (7th Cir.

2012), *cert. denied*, 133 S. Ct. 654 (2012), but this case does not implicate that debate because here the plaintiff has alleged an actual illegitimate motive and there is support for the notion that a "totally illegitimate animus" defeats rational basis review, *see Cruz v. Town of Cicero, Ill.*, 275 F.3d 579, 587 (7th Cir. 2001).[10] Thus, the Court concludes that the allegations of the complaint are sufficient to state a plausible substantive due process claim.

Which leaves the question of qualified immunity. The defendants cite authority that certain executive actions are measured by the "shocks the conscience" standard rather than an "improper motive" substantive due process test. *See United Artists Theatre Circuit, Inc. v. Twp. of Warrington, PA*, 316 F.3d 392, 400 (3d Cir. 2003) (deciding the standard applicable to municipal land use decisions). Even if Hughes is correct that the actual irrational bases for the defendants' actions that she alleges here are sufficient grounds on which to base a substantive due process claim, she has not identified caselaw that renders the contours of the right sufficiently clear to enable objectively reasonable officials to understand that an investigation like this, as hasty and as rushed as it is described in the complaint, would deprive her of substantive due process. Her reliance on *Doe v. Heck*, 327 F.3d 492, 521 (7th Cir. 2003), does not help her meet her burden to overcome the assertion of qualified immunity, as that case involved a child abuse investigation that resulted in the removal of a child from the familial home. In light of Hughes' failure to meet her burden to establish that the substantive due process

---

[10] In the context of substantive due process violations, however, there is also support, at least in the context of challenges to legislative action, for the proposition that any conceivable justification for government action would defeat a substantive due process claim. *See, e.g.*, *Greensburg Cmty. Sch. Corp.*, 743 F.3d 569, 576 ("So long as there is any conceivable state of facts that supports the policy, it passes muster under the due process clause; put another way, only if the policy is patently arbitrary would it fail."). Legislative action, however, is not susceptible to a motive inquiry, which distinguishes it from action by individual government actors.

rights she asserts were clearly established, the defendants are entitled to qualified immunity on the substantive due process claim.

*     *     *

For the reasons stated above, the defendants' motion to dismiss is denied as to the procedural due process claim, except as to claims predicated on the lack of expedited appeal, and granted as to the substantive due process claim.

Date: April 17, 2014

_____
John J. Tharp, Jr.
United States District Judge